# UNITED STATES  DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

DELACIE PHILLIPS                                    CIVIL ACTION

versus                                                      NO. 11-2725

N. BURL CAIN, WARDEN                        SECTION: "C" (1)

## REPORT AND RECOMMENDATION

This matter was referred to this United States Magistrate Judge for the purpose of conducting a hearing, including an evidentiary hearing, if necessary, and submission of proposed findings of fact and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B) and (C) and, as applicable, Rule 8(b) of the Rules Governing Section 2254 Cases in the United States District Courts.  Upon review of the record, the Court has determined that this matter can be disposed of without an evidentiary hearing.  See 28 U.S.C. § 2254(e)(2).  Therefore, for all of the following reasons, **IT IS RECOMMENDED** that the petition be **DISMISSED WITH PREJUDICE**.

Petitioner, Delacie Phillips, is a state prisoner incarcerated at the Louisiana State Penitentiary, Angola, Louisiana.  On September 4, 2003, he was convicted of first degree murder under Louisiana law.[1]  On September 29, 2003, he was sentenced to a term of life imprisonment

---

[1] State Rec., Vol. I of XI, minute entry dated September 4, 2003; State Rec., Vol. VI of XI, jury verdict form.

without benefit of probation, parole, or suspension of sentence.[2]  On December 8, 2004, the

Louisiana Fourth Circuit Court of Appeal affirmed that conviction and sentence.[3]  Petitioner's

related writ application was then denied by the Louisiana Supreme Court on December 16, 2005.[4]

On March 5, 2006, petitioner filed with the state district court an application for post-

conviction relief,[5] which he later supplemented in 2008.[6]  That application was denied on June 29,

2009.[7]  His related writ applications were likewise denied by the Louisiana Fourth Circuit Court of

Appeal on November 9, 2009,[8] and by the Louisiana Supreme Court on November 5, 2010.[9]

On October 26, 2011, petitioner filed the instant federal application for *habeas corpus*

relief.[10]

---

[2] State Rec., Vol. IV of XI, transcript of September 29, 2003; State Rec., Vol. I of XI, minute entry dated September 29, 2003.

[3] State v. Phillips, 891 So.2d 49 (La. App. 4th Cir. 2004) (No. 2004-KA-0092); State Rec., Vol. VIII of XI.

[4] State *ex rel.* Phillips v. State, 917 So.2d 1100 (La. 2005) (No. 2005-KH-0404); State Rec., Vol. IX of XI.

[5] State Rec., Vol. V of XI.

[6] State Rec., Vol. V of XI.

[7] State Rec., Vol. X of XI, transcript of June 29, 2009; State Rec., Vol. I of XI, minute entry dated June 29, 2009.

[8] State v. Phillips, No. 2009-K-1253 (La. App. 4th Cir. Nov. 9, 2009); State Rec., Vol. X of XI.

[9] State v. Phillips, 50 So.3d 815 (La. 2010) (No. 2009-KP-2689); State Rec., Vol. XI of XI.

[10] Rec. Doc. 3.

<u>I. Timeliness</u>

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") generally requires that a petitioner bring his Section 2254 claims within one (1) year of the date on which his underlying criminal judgment becomes "final."[11]  With respect to determining the date of finality, the United States Fifth Circuit Court of Appeals has explained:

> When a habeas petitioner has pursued relief on direct appeal through his state's highest court, his conviction becomes final ninety days after the highest court's judgment is entered, upon the expiration of time for filing an application for writ of certiorari with the United States Supreme Court.  <u>Roberts v. Cockrell</u>, 319 F.3d 690, 693 (5th Cir. 2003).  However, "[i]f the defendant stops the appeal process before that point," ... "the conviction becomes final when the time for seeking further direct review in the state court expires."  <u>Id</u>. at 694; <u>see also</u> <u>Foreman v. Dretke</u>, 383 F.3d 336, 338 (5th Cir. 2004) (Section 2244(d)(1)(A) gives alternative routes for finalizing a conviction: either direct review is completed or the time to pursue direct review expires).
>
> Although federal, not state, law determines when a judgment is final for federal habeas purposes, a necessary part of the finality inquiry is determining whether the petitioner is still able to seek further direct review.  <u>See</u> <u>Foreman</u>, 383 F.3d at 338-39.  As a result, this court looks to state law in determining how long a prisoner has to file a direct appeal.  <u>See</u> <u>Causey v. Cain</u>, 450 F.3d 601, 606 (5th Cir. 2006); <u>Roberts</u>, 319 F.3d at 693.

<u>Butler v. Cain</u>, 533 F.3d 314, 317 (5th Cir. 2008).

The state argues that petitioner's federal application is rendered untimely by the fact that his Louisiana Supreme Court writ application on direct review was untimely filed.  Where, as here, the state raises untimeliness is an affirmative defense, it bears the burden of proof on that issue.

---

[11]  Although § 2244(d)(1) has alternative provisions providing for other events which can trigger the commencement of the statute of limitations, those alternative provisions are not applicable in the instant case.

Fleming v. Evans, 481 F.3d 1249, 1257 (10th Cir. 2007); Gildon v. Bowen, 384 F.3d 883, 886 (7th Cir. 2004); Griffin v. Rogers, 308 F.3d 647, 653 (6th Cir. 2002); Gonzales Martinez v. Dretke, No. 3:04-CV-128, 2004 WL 2216564, at *2 (N.D. Tex. Oct. 1, 2004), adopted, 2004 WL 2389443 (N.D. Tex. Oct. 26, 2004). For the following reasons, the Court finds that the state has not met its burden of proof.

Under Louisiana law, a litigant has thirty days to file a writ application with the Louisiana Supreme Court to challenge a judgment of a state court of appeal. Louisiana Supreme Court Rule X, § 5(a). As noted, the Louisiana Fourth Court of Appeal affirmed petitioner's conviction and sentence on December 8, 2004, and, therefore, his related writ application had to filed with the Louisiana Supreme Court on or before January 7, 2005. A Louisiana prisoner's *pro se* state court filing is considered "filed" as of the moment the prisoner "placed it in the prison mail system." Causey v. Cain, 450 F.3d 601, 607 (5th Cir. 2006). The state provides no evidence in this case to prove that petitioner's Louisiana Supreme Court writ application was placed in the prison mail system after the deadline and was therefore untimely.

If the state had produced a prison mail log or equivalent evidence, such as an indigent mail receipt, showing that the application was given to prison officials after January 7, 2005, that would be conclusive evidence that the application was untimely. See Houston v. Lack, 487 U.S. 266, 275 (1988) ("[R]eference to prison mail logs will generally be a straightforward inquiry."); Stoot v. Cain, 570 F.3d 669, 672 (5th Cir. 2009) ("[R]eference to prison mail logs usually answers the question of when the petition was actually mailed."); Hebert v. Borer, Civ. Action No. 10-1530, 2011 WL 802618, at *2 (E.D. La. Jan. 31, 2011) (looking to indigent mail receipts to establish

timeliness), adopted, 2011 WL 794397 (E.D. La. Feb. 28, 2011); Swain v. Cain, Civ. Action No. 08-1643, 2009 WL 928493, at *2 (E.D. La. Apr. 3, 2009) (same).  However, the state produced no such evidence.

Likewise, if the writ application had been signed after that date, that could serve as at least *prima facie* evidence that it was untimely.  See, e.g., Jones v. Sumlin, Civ. Action No. 11-1520, 2011 WL 5509074, at *2 & n.19 (E.D. La. Oct. 19, 2011), adopted, 2011 WL 5508982 (E.D. La. Nov. 9, 2011); Titzer v. Cain, No. 07-4117, 2010 WL 4008351, at *4 n.23 (E.D. La. Aug. 10, 2010), adopted, 2010 WL 4000595 (E.D. La. Oct. 12, 2010); Marshall v. Warden, Avoyelles Correctional Center, Civ. Action No. 09-7231, 2010 WL 2977375, at *2 (E.D. La. June 11, 2010), adopted, 2010 WL 2978218 (E.D. La. July 20, 2010).  Unfortunately, petitioner's application was undated.

Instead, the state attempts to prove its contention by noting that the envelope in which petitioner's writ application was mailed bears a prison stamp stating that the envelope's contents were "NOT CENSORED" on January 11, 2005.  However, that proves nothing, in that one cannot necessarily infer that the envelope was *given* to prison officials on that same date.

The state also notes that the Louisiana Supreme Court's Clerk's Office docketed the application as case number 2005-KH-0404, with "KH" being that court's internal code for a collateral (rather than direct) review *pro se* writ application, and restyled the case from "State of Louisiana v. Delacie Phillips" to "State of Louisiana ex rel. Delacie Phillips v. State," with the latter being the form used for collateral review *pro se* filings.  However, such unilateral actions by the Clerk's Office upon docketing are not colorable evidence of untimeliness, because one cannot infer

from them that the justices ultimately found the writ application to be untimely. See Mead v. Cain, 243 Fed. App'x 874, 875 (5th Cir. 2007).

In light of the foregoing, this Court has no basis on which to conclude that petitioner's writ application in case number 2005-KH-0404 was untimely filed with Louisiana Supreme Court. As a result, the Court concludes that petitioner's state criminal judgment did not become final until March 16, 2006, when his period expired for seeking review by the United States Supreme Court.

Therefore, his federal limitations period would normally have commenced on that date. However, the AEDPA expressly provides: "The time during which a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is pending shall not be counted toward any period of limitation under this subsection." 28 U.S.C. § 2244(d)(2). In the instant case, petitioner filed such an application on March 5, 2006.[12] Accordingly, by the time petitioner's state criminal judgment became final on March 16, 2006, the federal limitations period had already been tolled by his state post-conviction filing. Tolling then continued uninterrupted for the duration of those post-conviction proceedings, so long as he sought supervisory review in a timely manner. Grillette v. Warden, Winn Correctional Center, 372 F.3d 765, 769-71 (5th Cir. 2004). The state does not contend that petitioner's related post-conviction

---

[12] State Rec., Vol. V of XI. The United States Fifth Circuit Court of Appeals has held that federal *habeas* courts must apply Louisiana's "mailbox rule" when determining the filing date of a Louisiana prisoner's *pro se* state court filing, and therefore such a document is considered "filed" as of the moment the prisoner "placed it in the prison mail system." Causey v. Cain, 450 F.3d 601, 607 (5th Cir. 2006). Here, that date cannot be gleaned with certainty from the record; however, because the application was dated March 5, 2006, it obviously was placed in the mail no earlier than that date.

writ applications were untimely filed with the state's appellate courts. As a result, the Court finds that tolling continued until the Louisiana Supreme Court denied relief on November 5, 2010.[13]

When the federal limitations period finally commenced on that date, petitioner had one year in which to seek federal *habeas corpus* relief. Because he filed his federal *habeas corpus* petition less than one year later on October 26, 2011,[14] it was timely filed. The Court will therefore address petitioner's claims.

## II.  Standards of Review

The AEDPA comprehensively overhauled federal *habeas corpus* legislation, including 28 U.S.C. § 2254. Amended subsections 2254(d)(1) and (2) contain revised standards of review for pure questions of fact, pure questions of law, and mixed questions of both. The amendments "modified a federal habeas court's role in reviewing state prisoner applications in order to prevent federal habeas 'retrials' and to ensure that state-court convictions are given effect to the extent possible under law." Bell v. Cone, 535 U.S. 685, 693 (2002).

As to pure questions of fact, factual findings are presumed to be correct and a federal court will give deference to the state court's decision unless it "was based on an unreasonable

---

[13]  A petitioner receives no additional tolling credit for the period during which he could have sought review by the United States Supreme Court with respect to the denial of post-conviction relief. Lawrence v. Florida, 549 U.S. 327, 332 (2007); Ott v. Johnson, 192 F.3d 510, 512-13 (5th Cir. 1999).

[14]  "A prisoner's habeas application is considered 'filed' when delivered to the prison authorities for mailing to the district court." Roberts v. Cockrell, 319 F.3d 690, 691 n.2 (5th Cir. 2003). Although that date is not readily ascertainable from the record, petitioner's federal application was dated October 26, 2011, and was in fact received by this Court on October 31, 2011, before the expiration of the federal limitations period.

determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2); see also 28 U.S.C. § 2254(e)(1) ("In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence.").

As to pure questions of law or mixed questions of law and fact, a federal court must defer to the state court's decision on the merits of such a claim unless that decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). Courts have held that the "'contrary to' and 'unreasonable application' clauses [of § 2254(d)(1)] have independent meaning." Bell, 535 U.S. at 694.

Regarding the "contrary to" clause, the United States Fifth Circuit Court of Appeals has explained:

> A state court decision is contrary to clearly established precedent if the state court applies a rule that contradicts the governing law set forth in the [United States] Supreme Court's cases. A state-court decision will also be contrary to clearly established precedent if the state court confronts a set of facts that are materially indistinguishable from a decision of the [United States] Supreme Court and nevertheless arrives at a result different from [United States] Supreme Court precedent.

Wooten v. Thaler, 598 F.3d 215, 218 (5th Cir.) (internal quotation marks, ellipses, brackets, and footnotes omitted), cert. denied, 131 S.Ct. 294 (2010).

Regarding the "unreasonable application" clause, the United States Supreme Court

has explained:

> [A] state-court decision can involve an "unreasonable application" of
> this Court's clearly established precedent in two ways. First, a
> state-court decision involves an unreasonable application of this
> Court's precedent if the state court identifies the correct governing
> legal rule from this Court's cases but unreasonably applies it to the
> facts of the particular state prisoner's case. Second, a state-court
> decision also involves an unreasonable application of this Court's
> precedent if the state court either unreasonably extends a legal
> principle from our precedent to a new context where it should not
> apply or unreasonably refuses to extend that principle to a new
> context where it should apply.

Williams v. Taylor, 529 U.S. 362, 407 (2000). The Supreme Court has noted that the focus of this

inquiry "is on whether the state court's application of clearly established federal law is objectively

unreasonable, and we stressed in Williams that an unreasonable application is different from an

incorrect one." Bell, 535 U.S. at 694; see also Puckett v. Epps, 641 F.3d 657, 663 (5th Cir. 2011)

("Importantly, 'unreasonable' is not the same as 'erroneous' or 'incorrect'; an incorrect application

of the law by a state court will nonetheless be affirmed if it is not simultaneously unreasonable.").

While the AEDPA standards of review are strict and narrow, they are purposely so.

As the United States Supreme Court recently held:

> [E]ven a strong case for relief does not mean the state court's
> contrary conclusion was unreasonable.
>
> If this standard is difficult to meet, that is because it was
> meant to be. As amended by AEDPA, § 2254(d) stops short of
> imposing a complete bar on federal court relitigation of claims
> already rejected in state proceedings. It preserves authority to issue
> the writ in cases where there is *no possibility* fairminded jurists could
> disagree that the state court's decision conflicts with this Court's
> precedents. It goes no farther. Section 2254(d) reflects the view that
> habeas corpus is a guard against *extreme malfunctions* in the state

criminal justice systems, *not a substitute for ordinary error correction through appeal. As a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.*

Harrington v. Richter, 131 S.Ct. 770, 786-87 (2011) (citations omitted; emphasis added).

### III.  Facts

Petitioner and Cassius Conaler were indicted of the first degree murder of Byron Cotton.  The cases were then severed, and petitioner went to trial.  On direct appeal, the Louisiana Fourth Circuit Court of Appeal summarized the facts adduced at petitioner's trial as follows:

Justin Moore testified at the trial regarding the facts surrounding the shooting death of Mr. Cotton.  Mr. Moore said that he had known Mr. Phillips for approximately ten years but that he had met Mr. Conaler for the first time the day before the shooting.  According to Mr. Moore, the shooting stemmed from an armed robbery perpetrated by Mr. Phillips and Mr. Conaler.  Mr. Moore and Mr. Phillips discussed robbing two drug dealers from Chicago, who were staying in an apartment in Metairie, Louisiana.  Although Mr. Moore had been acquainted with the drug dealers for six months or more, they were known to him only by their nicknames, Dog and Little Dog.

On the day before the shooting, Mr. Moore met with Mr. Conaler and Mr. Phillips to plan the robbery.  Mr. Moore also gave Mr. Phillips a Glock .40 caliber semi-automatic handgun to use in connection with the robbery.  At approximately 10:00 p.m. that night, Mr. Phillips and Mr. Conaler called Mr. Moore to arrange the robbery.  The three men then met outside the drug dealers' apartment.

According to Mr. Moore, Mr. Cotton was not involved in the robbery, but he was in Mr. Moore's car while some of the events connected with the robbery transpired.  Because Mr. Moore wanted to protect Mr. Cotton from having any responsibility in connection with the crime, he told Mr. Cotton to remain in the car while he spoke to Mr. Phillips and Mr. Conaler.

Mr. Moore, who was a friend of the drug dealers, originally went into their apartment where he saw a stack of money on a table. He then left the apartment and told Mr. Phillips and Mr. Conaler what he had observed. Mr. Moore then knocked on the apartment door again, and Mr. Conaler forced his way into the apartment, where he and Mr. Phillips robbed Dog and Little Dog. Mr. Moore claimed that he did not actually participate in the robbery but that he left the scene in his car with Mr. Cotton after he knocked on the apartment door for the purpose of facilitating the entry of Mr. Phillips and Mr. Conaler into the apartment.

At approximately 3:50 a.m. the morning after the robbery, Mr. Moore saw on his telephone caller ID that Mr. Phillips had called him. He returned the call and spoke with Lisa Washington, Mr. Phillips' girlfriend, who said that Mr. Phillips and Mr. Conaler had been trying to contact him. She then gave Mr. Moore a telephone number where he could call them. Mr. Moore called the number and spoke with Mr. Conaler, who said that he and Mr. Phillips needed to meet with him so that they could divide the robbery proceeds and give Mr. Moore his share.

The men agreed to meet across from a Frostop in the Algiers section of New Orleans. Mr. Moore drove there with Mr. Cotton. When everyone had arrived, Mr. Moore asked Mr. Phillips to return the gun that Mr. Moore had loaned him. Mr. Conaler then suggested that they all go somewhere suitable to divide the robbery proceeds. Mr. Moore said that they could do this at his girlfriend's home. His girlfriend and her mother lived on Elizardi Street, which was nearby. Mr. Phillips and Mr. Conaler drove to the Elizardi Street residence in their car, and Mr. Moore and Mr. Cotton drove there in Mr. Moore's car.

Mr. Moore arrived at his girlfriend's residence first. When Mr. Phillips and Mr. Conaler arrived, they came up to Mr. Moore's car and pulled on the car's rear door handles. Mr. Moore then let them into the back seat of his car. Mr. Phillips sat behind Mr. Cotton, who was sitting in the front passenger seat, and Mr. Conaler sat behind Mr. Moore, who was sitting in the driver's seat. According to Mr. Moore, he asked how much money had been taken in the robbery, and Mr. Conaler told him that it was twelve thousand dollars. As Mr. Moore was turning around in the car, out of the corner of his eye he saw Mr. Phillips holding the gun that he had loaned to Mr. Phillips. He saw Mr. Phillips firing the gun at him, and he then heard two more gunshots. He waited in the car until he thought that Mr. Phillips and Mr. Conaler had left the scene. Mr.

Moore then stumbled out of his car and went to the front door of his girlfriend's residence.

He testified at the trial that his girlfriend's mother picked him up and took him inside her house. When he was asked at the trial whether he had said anything to his girlfriend's mother, he testified that he had asked her whether he was going to die, and she said no. He further testified that he then kept saying, "They hit me." When his girlfriend's mother asked who had hit him, he said that "Delate" had hit him. He was trying to say "Delacie", but she thought that he was saying "they late" instead.

At 4:32 a.m. a telephone call to 911 was received from the residence of Mr. Moore's girlfriend. The ensuing investigation revealed that Mr. Cotton and Mr. Moore had both been shot in the head while they were sitting in Mr. Moore's car in front of his girlfriend's house. Mr. Cotton's lifeless body was found inside the car. Mr. Moore was critically wounded and was taken to a hospital. After two operations and a lengthy rehabilitation process, Mr. Moore ultimately recovered from the gunshot wound that he suffered.

The lead investigator in this case was New Orleans Police Department Detective John Duzac. When he arrived on the scene of the crime, he directed the crime lab personnel to take photographs of the scene and to collect evidence. He noted that there were bloodstains on the driver's seat of Mr. Moore's car and that there was a bullet mark on its front windshield that indicated that a bullet fired from inside the car had struck the windshield. The car was also dusted for fingerprints.

Detective Duzac was not able to talk to Mr. Moore for the first week that he was in the hospital, but he continued to communicate with Mr. Moore's relatives and girlfriend. Three days after the shooting, Detective Duzac learned from Mr. Moore's mother that her son had named Mr. Phillips as the person who shot him. The day after he received this information, Detective Duzac learned from Mr. Moore's girlfriend that he had named a second person who was involved in the shooting. The name that he gave to his girlfriend was "Chastity." Because the names "Chastity" and "Cassius" contain similar sounds, it was assumed that Mr. Moore was referring to Mr. Conaler, whose first name was Cassius. At the trial Mr. Moore confirmed that he was trying to say "Cassius" when he said "Chastity."

Six days after the shooting, Detective Duzac went to the hospital where Mr. Moore was being treated, and he showed Mr. Moore a photographic lineup that included a picture of Mr. Phillips.

Mr. Moore told the detective that he knew Mr. Phillips, and he selected Mr. Phillips' photograph from the lineup and identified him as the person who had shot him.

At the same time that he showed Mr. Moore the lineup containing Mr. Phillips' photograph, Detective Duzac showed Mr. Moore a second photographic lineup that contained a picture of Kendrick Cooper, who had been developed as a possible suspect. A telephone call from the residence of Ingrid Nelson [FN1] on Lang Street in Algiers had been made to the cell phone used by Mr. Moore less than an hour prior to the time that the 911 call was made to report the shootings. When Detective Duzac investigated the call, he learned that Mr. Cooper lived on Lang Street at Ms. Nelson's house. Therefore, he wanted to determine whether Mr. Moore could identify Mr. Cooper as one of the people involved in Mr. Cotton's death. Mr. Moore, however, could not identify anyone in the photographic lineup containing Mr. Cooper's picture.

> [FN1] Ms. Nelson testified at the trial that she knew Mr. Phillips and that he had come to her house early in the morning prior to the shootings accompanied by another man. She gave permission for the other man to use her telephone.

After Detective Duzac learned that Mr. Phillips lived in Kenner, Louisiana, he engaged the assistance of the Kenner police department in obtaining a search warrant for Mr. Phillips' residence. Detective Duzac was looking for blood-stained clothing or shoes, a Glock .40 semi-automatic handgun, and a gray 1990 Chevrolet Baretta that he believed was used by Mr. Phillips to leave the scene of the shootings.

Upon arriving at the residence, the officers who were conducting the search located the vehicle. Inside the residence the officers recovered pants, shoes, a wallet, and Mr. Phillips' Louisiana identification card and driver's license. Additionally, during the search, a Bank of Louisiana savings deposit slip dated four days after the shooting, showing a deposit in the amount of one thousand dollars cash, was seized, and it was admitted into evidence at the trial. No blood was found on any of the items that were seized or on the Chevrolet Baretta.

When the warrant was executed, Mr. Phillips was already in police custody. During the execution of the warrant at Mr. Phillips' residence, Detective Duzac spoke with Mr. Phillips' girlfriend, Lisa

Washington. She had been living with Mr. Phillips at his residence. She told the detective that Mr. Phillips "hangs" with "Justin [Mr. Moore] and Cassius [Mr. Conaler]" and that Cassius' name and telephone number were recorded on the telephone caller ID at the residence. A photograph of the caller ID read-out was made and ultimately admitted into evidence at the trial.

After the search of Mr. Philips' residence, Detective Duzac compiled a photographic lineup that included a picture of Mr. Conaler. Mr. Moore identified Mr. Conaler from the lineup as the second person involved in the homicide of Mr. Cotton. The next day a search of Mr. Conaler's home was conducted. Shoes, clothing, Mr. Conaler's driver's license, and his telephone bill were recovered. Additionally, an attorney's business card was found. The card contained a receipt[FN2] for five hundred dollars that had been paid to the attorney to represent Mr. Phillips.

[FN2]  The receipt was dated prior to Mr. Cotton's death.

Mr. Moore gave two taped statements to the police regarding Mr. Cotton's death. In the first statement Mr. Moore said that he was shot while he was walking outside his car and that he could not remember where Mr. Conaler was when the shooting occurred. A week after that statement, Detective Duzac received a telephone call from Mr. Moore saying that he now remembered what had happened on the night of the shooting. A second taped statement was taken, and in that statement Mr. Moore stated that he was shot while he was inside his car. This statement comported with the evidence. The amount of the blood found in his car indicated that Mr. Moore had been shot there. Mr. Moore also testified at the trial that he did not remember telling his doctors that he did not know who shot him, a statement that was reflected in his medical records.

When Mr. Moore was questioned at the trial regarding the discrepancies in his two taped statements, he explained that he was heavily medicated, that he had just undergone surgery, and that his memory was clouded when he gave the first statement. He testified, however, that he had recovered his memory when he gave the second statement, which he claimed was accurate.

When Detective Duzac was questioned at the trial regarding the armed robbery of the two drug dealers, Dog and Little Dog, he said that he had not investigated the robbery, because he had no jurisdiction to investigate crimes in Jefferson Parish, where Metairie

is located and where the robbery allegedly occurred. He said that the robbery had not been reported to authorities and that he had made no effort to locate Dog and Little Dog.

Dr. Paul McGary, a forensic pathologist, testified at the trial that he had performed an autopsy on Mr. Cotton. He said that Mr. Cotton died from a single gunshot wound to the back of the head. The wound was a contact wound, which meant that the barrel of the gun had been pushed against the skin on the back of Mr. Cotton's neck.

An expert in ballistics and firearms identification, a fingerprint examiner, a firearms examiner, and a crime lab technician also testified at the trial. Their testimony indicated that there was no direct physical evidence that could unequivocally link Mr. Phillips with Mr. Cotton's death.

The defense called three witnesses at the trial. They were Ms. Washington[FN3], who was Mr. Phillips' girlfriend at the time of Mr. Cotton's death, her daughter, Mallory Washington, and Mr. Phillips' sixteen-year-old daughter, Detrice Murray.

> [FN3] At the time of the trial Ms. Washington was using Williams as her last name.

Ms. Murray testified first. She stated that her father had injured his ankle playing basketball and that he was using crutches at the time of Mr. Cotton's death. She also testified that she had overheard her father talking on the telephone to a person named Justin, which was Mr. Moore's first name. Her father had told Justin that he was wrong to stash "the stuff" at her father's house. She also testified that her father washed his clothes at her grandmother's house and that there was no washer or dryer where he lived.

Ms. Washington's daughter, Mallory, corroborated Ms. Murray's testimony that there was no washer or dryer at Mr. Phillips' residence and that Mr. Phillips was walking on crutches when Mr. Cotton was killed. She also testified that she had heard Mr. Phillips having an argument on the telephone with someone named Justin.

Ms. Washington was the final witness for the defense. She testified that Mr. Phillips left his residence at approximately 10:30 p.m. on the night of Mr. Cotton's death and that he returned home the following morning at approximately 5:00 a.m. She also testified that Mr. Conaler had telephoned Mr. Phillips after he had returned home that morning but that she had answered the telephone, because Mr. Phillips was in the shower. She also stated that, despite Detective

Duzac's testimony, she never told him that Mr. Phillips washed his clothes when he got home in the morning after the homicide. She stated that there was no washer or dryer in the apartment and that Mr. Phillips usually took his clothes to his mother's house to be laundered. Ms. Washington also testified that Mr. Phillips and Mr. Conaler were together on the night of Mr. Cotton's death. Ms. Washington further stated that Mr. Phillips had injured his ankle and was walking on crutches at the time of the shootings. Finally, Ms. Washington identified the bank deposit slip showing a one thousand dollar deposit in Mr. Phillips' name, and she testified that Mr. Phillips earned no more than two hundred dollars a week, which he used for paying bills.[15]

## IV.  Petitioner's Claims

## A.  Sufficiency of the Evidence

Petitioner's first claim is that the evidence was insufficient to support his conviction.

On direct appeal, the Louisiana Fourth Circuit Court of Appeal rejected that claim, holding:

> [Petitioner] contends that the evidence was not sufficient to support his conviction, because the State of Louisiana did not negate any reasonable probability that he had been misidentified.

> **Applicable Law**

> In Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), the United States Supreme Court held that the Due Process Clause of the Fourteenth Amendment to the United States Constitution, U.S. Const. amend. XIV, § 1, creates the following standard of review for federal courts reviewing a state conviction:

> > [T]he critical inquiry on review of the sufficiency of the evidence to support a criminal conviction must be ... whether the record evidence could reasonably support a finding of guilt beyond a reasonable doubt....  [T]he relevant question is whether, after

---

[15]  Phillips, 891 So.2d at 50-54; State Rec., Vol. VIII of XI.

> viewing the evidence in the light most favorable to
> the prosecution, any rational trier of fact could have
> found the essential elements of the crime beyond a
> reasonable doubt.

443 U.S. at 318-19, 99 S.Ct. 2781 at 2788-89 (footnote omitted) (citation omitted).

In State v. Mussall, 523 So.2d 1305 (La. 1988), the Louisiana Supreme Court stated that "this court ... recognized that ... the Jackson holding also applies to state direct review of criminal convictions." Id. at 1309. The Supreme Court in Mussall also recognized that the Louisiana Constitution has a due process clause "virtually identical to its Fourteenth Amendment model. La. Const., Art. I, § 2." Id.

The Supreme Court in Mussall stated that a review of the record in a criminal case does not require the reviewing court to determine whether the reviewing court believes the evidence at the trial established guilt beyond a reasonable doubt. The Supreme Court further stated as follows:

> [A] reviewing court must consider the record through
> the eyes of a hypothetical rational trier of fact who
> interprets all of the evidence as favorably to the
> prosecution as any rational fact finder can.... [T]he
> inquiry requires the reviewing court to ask whether
> such a hypothetical rational trier of fact interpreting
> all of the evidence in this manner could have found
> the essential elements of the crime beyond a
> reasonable doubt.

523 So.2d at 1309-10 (footnotes omitted). See also State v. Marcantel, 2000-1629, p. 9 (La. 4/3/02), 815 So.2d 50, 56, in which the Supreme Court stated that "[w]here there is no physical evidence to link a defendant to the crime charged, the testimony of one witness, if believed by the trier of fact, is sufficient support for a factual conclusion required for a verdict of guilty." 2000-1629, p. 9, 815 So.2d at 56 (emphasis added).

In State v. Ash, 97-2061, pp. 4-5 (La.App. 4 Cir. 2/10/99), 729 So.2d 664, 667, this Court articulated the standard of review that is applicable to a claim that the evidence produced at a criminal trial was constitutionally insufficient to support a conviction. This Court stated:

In evaluating whether evidence is constitutionally sufficient to support a conviction, an appellate court must determine whether, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the defendant guilty beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). The reviewing court is to consider the record as a whole and not just the evidence most favorable to the prosecution; and, if rational triers of fact could disagree as to the interpretation of the evidence, the rational decision to convict should be upheld.

In State v. Edwards, 97-1797 (La. 7/2/99), 750 So.2d 893, the Louisiana Supreme Court discussed the prosecution's burden in a criminal case where the defendant's identity is disputed. The Supreme Court stated that "[w]hen identity is disputed, the state must negate any reasonable probability of misidentification in order to satisfy its burden to establish every element of the crime charged beyond a reasonable doubt." 97-1797, p. 12, 750 So.2d at 902. See also State v. Smith, 430 So.2d 31, 45 (La. 1983).

**Analysis**

In the instant case Mr. Phillips does not dispute that Mr. Cotton was a victim of first degree murder, which is defined in La. R.S. 14:30 as the killing of a human being when the offender has the specific intent to kill or to inflict great bodily harm upon more than one person. La. R.S. 14:30(A)(3). Because he only disputes the identification made by Mr. Moore, we need only address that element of the crime for which Mr. Phillips was convicted.

In noting that there was no physical evidence linking him to Mr. Cotton's murder, Mr. Phillips attacks the credibility of Mr. Moore. Mr. Phillips claims that Mr. Moore's testimony should not have been accepted by the jury, because Mr. Moore suffered from memory impairment as a result of the gunshot wound to his head. Mr. Phillips also argues that Mr. Moore's testimony is suspect, because in the initial taped statement Mr. Moore gave to the police, the description he gave of where the shooting occurred was inconsistent with the physical evidence. Mr. Phillips argues that the

reason the description in the second taped statement corresponds with the physical evidence is that the physical evidence had been discussed in Mr. Moore's presence in the interim between the first and second statements. Mr. Phillips also claims that there is a reference in Mr. Moore's medical records to the effect that Mr. Moore told a doctor that he did not know who shot him.

Mr. Phillips also claims that the story about an armed robbery of two Chicago drug dealers was not credible. In support of this argument he contends that Detective Duzac never attempted to locate the victims of the robbery to corroborate Mr. Moore's story and that Mr. Moore did not know the names of the drug dealers despite the fact that he claimed to have been friends with them and to have visited shopping malls and girls' homes with them.

Under the applicable law, it is not our function to assess the credibility of Mr. Moore's testimony. Instead, we are to determine whether a hypothetical rational trier of fact interpreting all of the evidence in this case could find the essential elements of the crime beyond a reasonable doubt. See, e.g., State v. Mussall, 523 So.2d 1305 (La. 1988). In this case Mr. Moore testified that he told his girlfriend's mother shortly after he was shot that "Delate" shot him. He also testified that he intended to say "Delacie" but could not articulate that word at the time. Mr. Moore has never wavered in his contention that it was Mr. Phillips who shot him and Mr. Cotton. Although there may have been some inconsistencies in his statements to the police, those inconsistencies never involved the identity of Mr. Phillips as the person who shot him.

This case does not involve a situation where the police developed a suspect and then had Mr. Moore identify the suspect. In fact, when the police developed a possible suspect on their own, Mr. Moore was not able to identify him. Mr. Moore had known Mr. Phillips for a number of years and has always maintained that Mr. Phillips was the person who shot him and Mr. Cotton.

Additionally, Ms. Washington testified that Mr. Phillips and Mr. Conaler were together on the night of the shooting. Various telephone records that were subpoenaed and presented at the trial corroborated that Mr. Moore, Mr. Phillips, and Mr. Conaler were in telephone contact throughout the evening and the early morning hours when the alleged robbery and the shootings occurred. Ms. Ingrid Nelson, a friend of Mr. Phillips, testified that Mr. Phillips and another man came to her house shortly before the nearby shootings occurred and used her telephone.

We also note that Mr. Phillips' contention that the story of the robbery of the two drug dealers was an unbelievable fabrication does not necessarily mean that Mr. Moore's testimony regarding the subsequent shooting was not truthful. Mr. Moore may well have been unwilling to divulge the real names of the two drug dealers, because he feared retaliation from them. At the time of the trial Mr. Moore had relocated his residence away from New Orleans, and he did not want to reveal where he was living. This clearly indicates that he feared some type of reprisal as a result of his trial testimony.

Finally, it is clear that even in the absence of physical evidence, if the jury believed Mr. Moore's testimony, then that testimony was a sufficient basis upon which the jury could find Mr. Phillips guilty of first degree murder. The testimony of one witness, if believed by a jury, is sufficient evidence for a conviction. See State v. Marcantel, 2000-1629, p. 9 (La. 4/3/02), 815 So.2d 50, 56. In the instant case, the jury was fully apprised of all of the facts relating to any inconsistencies involved in Mr. Moore's statements. Based on the trial testimony of all of the witnesses in its entirety, the jury found that Mr. Phillips' was guilty of the first degree murder of Mr. Cotton. We find that a jury rationally interpreting all of the evidence in this case could find the essential elements of the crime of first degree murder beyond a reasonable doubt. We further find that the prosecution negated any reasonable probability that Mr. Moore misidentified Mr. Phillips as the person who shot him and Mr. Cotton. Based on the foregoing, we find that Mr. Phillips' assignment of error is without merit.[16]

The Louisiana Supreme Court then denied petitioner's related writ application without assigning additional reasons.[17]

Because a sufficiency of the evidence claim presents a mixed question of law and fact, this Court must defer to the state court's decision rejecting petitioner's claim unless he shows that the decision "was contrary to, or involved an unreasonable application of, clearly established

---

[16] Phillips, 891 So.2d at 54-57; State Rec., Vol. VIII of XI.

[17] State ex rel. Phillips v. State, 917 So.2d 1100 (La. 2005) (No. 2005-KH-0404); State Rec., Vol. IX of XI.

Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1); Taylor v. Day, Civ. Action No. 98-3190, 1999 WL 195515, at *3 (E.D. La. Apr. 6, 1999), aff'd, 213 F.3d 639 (5th Cir. 2000). For the following reasons, the Court finds that petitioner has made no such showing.

As correctly noted by the state court, claims of insufficient evidence are to be analyzed pursuant to the standard set forth in Jackson v. Virginia, 443 U.S. 307 (1979), which held that "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Id. at 319. Accordingly, "[t]he Jackson inquiry 'does not focus on whether the trier of fact made the *correct* guilt or innocence determination, but rather whether it made a *rational* decision to convict or acquit.'" Santellan v. Cockrell, 271 F.3d 190, 193 (5th Cir. 2001) (quoting Herrera v. Collins, 506 U.S. 390, 402 (1993)) (emphasis added). Moreover, Louisiana's circumstantial evidence standard requiring that the every reasonable hypothesis of innocence be excluded does *not* apply in federal *habeas corpus* proceedings; in these proceedings, *only* the Jackson standard need be satisfied, even if state law would impose a more demanding standard of proof. Foy v. Donnelly, 959 F.2d 1307, 1314 n.9 (5th Cir. 1992); Higgins v. Cain, Civ. Action No. 09-2632, 2010 WL 890998, at *21 n.38 (E.D. La. Mar. 8, 2010), aff'd, 434 Fed. App'x 405 (5th Cir. 2011), cert. denied, No. 11-7628, 2012 WL 685788 (U.S. Mar. 5, 2012); Williams v. Cain, No. 07-4148, 2009 WL 224695, at *4 (E.D. La. Jan. 29, 2009); Davis v. Cain, Civ. Action No. 07-6389, 2008 WL 5191912, at *14 (E.D. La. Dec. 11, 2008); Wade v. Cain, Civil Action No. 05-0876, 2008

WL 2679519, at *6 (W.D. La. May 15, 2008) (Hornsby, M.J.) (adopted by Stagg, J., on July 3, 2008), aff'd, 372 Fed. App'x 549 (5th Cir. Apr. 9, 2010).

There was no question that the elements of first degree robbery were established in this case, in that testimony at trial clearly established that the perpetrator had the specific intent to kill or inflict great bodily harm on more than one person. The only issue disputed issue was whether petitioner was the perpetrator.

In the instant case, petitioner was identified as the shooter by Justin Moore, an eyewitness. Under both federal and Louisiana law, the testimony of a single eyewitness is generally sufficient to support a conviction. See United States v. King, 703 F.2d 119, 125 (5th Cir. 1983); State v. Neal, 796 So.2d 649, 658 (La. 2001).

To the extent that petitioner is contending that Moore's identification was unreliable, that contention clearly has no merit. This is not a case in which the witness's identification is based on a brief encounter with a stranger; on the contrary, Moore had known petitioner for almost ten years.[18] Where, as here, the witness recognized the perpetrator as someone he already knew, there simply is no "substantial likelihood of irreparable misidentification." See United States v. Hefferon, 314 F.3d 211, 219 (5th Cir. 2002); United States v. Buckhalter, 986 F.2d 875, 878 (5th Cir. 1993); Sholes v. Cain, Civ. Action No. 06-1831, 2008 WL 2346151, at *16 (E.D. La. June 6, 2008), aff'd, 370 Fed. App'x 531 (5th Cir.), cert. denied, 131 S. Ct. 292 (2010).

To the extent that petitioner is contending that Moore's identification was not credible, that was an issue for the jury, not a federal *habeas* court. Where a petitioner's insufficient

---

[18] State Rec., Vol. VIII of XI, transcript of September 3, 2003, p. 146.

evidence claim is based on the credibility of a witness, a federal *habeas* court generally will not

grant relief.  See Schlup v. Delo, 513 U.S. 298, 330 (1995) ("[U]nder Jackson [v. Virginia, 443 U.S.

307 (1979)], the assessment of the credibility of witnesses is generally beyond the scope of

review."); Ramirez v. Dretke, 398 F.3d 691, 695 (5th Cir. 2005) ("All credibility choices and

conflicting inferences are to be resolved in favor of the verdict."); McCowin v. Scott, No. 93-5340,

1994 WL 242581, at *2 (5th Cir. May 26, 1994) (A "challenge of the jury's credibility choice fails

to satisfy the Jackson standard for habeas relief."); Picou v. Cain, Civ. Action No. 06-6258, 2007

WL 1521021, at *5 (E.D. La. May 22, 2007).

   For the reasons noted by the state court, the evidence presented in the instant case,

including Moore's eyewitness account, viewed in the light most favorable to the prosecution, was

clearly sufficient for any rational trier of fact to find petitioner guilty beyond a reasonable doubt.

Therefore, he cannot show that the state court's decision rejecting his claim was contrary to, or

involved an unreasonable application of, clearly established federal law, as determined by the

Supreme Court of the United States.  Accordingly, this Court should defer to the state court's

decision rejecting that claim.

B.  Unduly Suggestive Identification Procedure

   In a variation of the foregoing claim, petitioner next asserts a separate, freestanding

claim that his identification resulted from an unduly suggestive identification procedure.  The state

contends that this claim is unexhausted and procedurally barred.  However, this Court need not

address those contentions, because the claim is clearly meritless and simply should be denied on that basis for the following reasons.[19]

As the United States Fifth Circuit Court of Appeals has explained:

> The Due Process Clause protects against the use of evidence *obtained from* impermissibly suggestive identification procedures. The admissibility of identification evidence is governed by a two-step test: First, we determine whether the identification procedure was impermissibly suggestive, and second, we ask whether the procedure posed a very substantial likelihood of irreparable misidentification. If we answer both questions in the affirmative, the identification is inadmissible. This is known as the <u>Brathwaite</u> test, after <u>Manson v. Brathwaite</u>, 432 U.S. 98, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977).

<u>United States v. Moody</u>, 564 F.3d 754, 762 (5th Cir. 2009) (quotation marks and citations omitted; emphasis added). In the instant case, petitioner's claim fails on both of those two prongs.

The claim fails on the first prong because petitioner's identification was not "*obtained from* impermissibly suggestive identification procedures" or, indeed, from any purported misconduct by the state. Petitioner is *not* contending that the state employed an identification procedure which was itself improper; rather, he is contending that Moore was unduly influenced *by his family* to identify petitioner. Such private conduct simply is not attributable to the state so as to

---

[19]   A federal court has the authority to deny *habeas* claims on the merits, regardless of whether the petitioner exhausted his state court remedies and whether exhaustion is waived by the state. 28 U.S.C. § 2254(b)(2); <u>Jones v. Jones</u>, 163 F.3d 285, 299 (5th Cir. 1998); <u>Woods v. Cain</u>, Civ. Action No. 06-2032, 2008 WL 2067002, at *8 n.8 (E.D. La. May 13, 2008). Moreover, a federal *habeas* court need not determine whether a claim is procedurally barred when the claim clearly fails on the merits. <u>See</u> <u>Glover v. Hargett</u>, 56 F.3d 682, 684 (5th Cir. 1995); <u>Wiley v. Puckett</u>, 969 F.2d 86, 104 (5th Cir. 1992); <u>Williams v. Cain</u>, Civ. Action No. 11-1777, 2012 WL 253109, at *2 (E.D. La. Jan. 3, 2012), <u>adopted</u>, 2012 WL 253063 (E.D. La. Jan. 26, 2012); <u>Corzo v. Murphy</u>, Civ. Action No. 07-7409, 2008 WL 3347394, at * 1 n.5 (E.D. La. July 30, 2008).

implicate the Due Process Clause.  As the United States Supreme Court recently noted, "what triggers due process concerns is *police use* of an unnecessarily suggestive identification procedure." Perry v. New Hampshire, 132 S.Ct. 716, 721 n. 1 (2012) (emphasis added).  The Supreme Court explained:

> We have not extended pretrial screening for reliability to cases in which the suggestive circumstances were not arranged by law enforcement officers.  Petitioner requests that we do so because of the grave risk that mistaken identification will yield a miscarriage of justice.  Our decisions, however, turn on the presence of state action and aim to deter police from rigging identification procedures, for example, at a lineup, showup, or photograph array.  When no improper law enforcement activity is involved, we hold, it suffices to test reliability through the rights and opportunities generally designed for that purpose, notably, the presence of counsel at postindictment lineups, vigorous cross-examination, protective rules of evidence, and jury instructions on both the fallibility of eyewitness identification and the requirement that guilt be proved beyond a reasonable doubt.

Id. at 720-21 (footnote omitted).

Morever, petitioner's claim also fails on the second prong.  As previously explained, where, as here, the witness in question recognized the perpetrator as someone he already knew, there simply is no "substantial likelihood of irreparable misidentification."  See United States v. Hefferon, 314 F.3d 211, 219 (5th Cir. 2002); United States v. Buckhalter, 986 F.2d 875, 878 (5th Cir. 1993); Sholes v. Cain, Civ. Action No. 06-1831, 2008 WL 2346151, at *16 (E.D. La. June 6, 2008), aff'd, 370 Fed. App'x 531 (5th Cir.), cert. denied, 131 S.Ct. 292 (2010).

Accordingly, petitioner's claim has no merit and should be denied.

<u>C.  Confrontation Clause</u>

Petitioner's next claim is somewhat muddled.  He contends that he was denied his rights under the Confrontation Clause "by out-of-court statements given by the victim's family members that was used to procure a photographic line-up and search warrant."[20]  He argues that the prosecutor and defense counsel should have called the "family members and Detective Duzac as witnesses to adequately question their exchange of out-of-court statements leading to the arrest, photographic line-up, and search warrant regarding petitioner."[21]  The gist of this claim is that Moore did not in fact remember who fired the shots and that petitioner's identification was instead based purely on the suggestions of Moore's family members.  Petitioner opines that it was this information from the family members which led to him becoming a suspect and ultimately to his arrest.  Petitioner argues that this theory of the case should have been explored at trial.

The state contends that this claim is also unexhausted and procedurally barred.  However, because the claim has no merit for the following reasons, and it is recommended that the claim simply be denied on that basis.

The Confrontation Clause provides that, "[i]n all criminal prosecutions, the accused shall enjoy the right ... to be confronted with the witnesses against him." U.S. Const. amend. VI.  "[T]his bedrock procedural guarantee applies to both federal and state prosecutions." <u>Crawford v. Washington</u>, 541 U.S. 36, 42 (2004).  Simply put, "the Confrontation Clause prohibits (1) testimonial out-of-court statements; (2) made by a person who does not appear at trial; (3) received

---

[20]  Rec. Doc. 3, p. 24.

[21]  Rec. Doc. 3, p. 24.

against the accused; (4) to establish the truth of the matter asserted; (5) unless the declarant is unavailable and the defendant had a prior opportunity to cross examine him." United States v. Gonzales, 436 F.3d 560, 576 (5th Cir. 2006). As a result, a criminal defendant's right to confrontation is considered a "trial right" which is "inapplicable to earlier stages in the criminal process." Favre v. Henderson, 464 F.2d 359, 367 n.16 (5th Cir. 1972).

The instant allegations simply do not implicate the Confrontation Clause. Petitioner's "accuser" at trial was *Moore*, and petitioner had the opportunity to, and in fact did, confront Moore through cross-examination. Even if Moore's family members also independently believed that petitioner was the perpetrator, they were not his accusers at trial, and so he had no right to confront them at trial. Likewise, although petitioner argues that he was unable to confront Detective Duzac at trial, that is simply untrue. Duzac testified at trial and was subjected to vigorous cross-examination.[22]

To the extent that petitioner is additionally suggesting that defense counsel should have called the family members at trial to ferret out admissions that Moore did not in fact remember the crime and that they influenced him to identify petitioner, that is a Sixth Amendment ineffective assistance claim rather than a Confrontation Clause claim. However, even when construed in that manner, the claim fares no better for the following reasons.

The United States Supreme Court established a two-prong test for evaluating claims of ineffective assistance of counsel. A petitioner seeking relief must demonstrate that counsel's performance was deficient *and* that the deficient performance prejudiced his defense. Strickland v.

_____

[22] State Rec., Vols. VII and VIII, transcript of September 3, 2003, pp. 22-100.

Washington, 466 U.S. 668, 697 (1984). A petitioner bears the burden of proof on such a claim and "must demonstrate, by a preponderance of the evidence, that his counsel was ineffective." Jernigan v. Collins, 980 F.2d 292, 296 (5th Cir. 1993); see also Clark v. Johnson, 227 F.3d 273, 284 (5th Cir. 2000). If a court finds that a petitioner has made an insufficient showing as to either of the two prongs of inquiry, i.e. deficient performance or actual prejudice, it may dispose of the ineffective assistance claim without addressing the other prong. Strickland, 466 U.S. at 697.

To prevail on the deficiency prong of the Strickland test, a petitioner must demonstrate that counsel's conduct fails to meet the constitutional minimum guaranteed by the Sixth Amendment. See Styron v. Johnson, 262 F.3d 438, 450 (5th Cir. 2001). "Counsel's performance is deficient if it falls below an objective standard of reasonableness." Little v. Johnson, 162 F.3d 855, 860 (5th Cir. 1998). Analysis of counsel's performance must take into account the reasonableness of counsel's actions in light of all the circumstances. See Strickland, 466 U.S. at 689. "[I]t is necessary to 'judge ... counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct.'" Lockhart v. Fretwell, 506 U.S. 364, 371 (1993) (quoting Strickland, 466 U.S. at 690). A petitioner must overcome a strong presumption that the conduct of his counsel falls within a wide range of reasonable representation. See Crockett v. McCotter, 796 F.2d 787, 791 (5th Cir. 1986); Mattheson v. King, 751 F.2d 1432, 1441 (5th Cir. 1985).

In order to prove prejudice, a petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland, 466 U.S. at 694. In this context, a reasonable probability is "a

probability sufficient to undermine confidence in the outcome." Id. In making a determination as to whether prejudice occurred, courts must review the record to determine "the relative role that the alleged trial errors played in the total context of [the] trial." Crockett, 796 F.2d at 793.

Any contention that petitioner's counsel was ineffective for failing to call Moore's family members as witnesses fails because there has been no showing that their testimony would have benefitted the defense. As the United States Fifth Circuit Court of Appeals has explained:

> Claims that counsel failed to call witnesses are not favored on federal habeas review because the presentation of witnesses is generally a matter of trial strategy and speculation about what witnesses would have said on the stand is too uncertain. For this reason, we require petitioners making claims of ineffective assistance based on counsel's failure to call a witness to demonstrate prejudice *by naming the witness, demonstrating that the witness was available to testify and would have done so, setting out the content of the witness's proposed testimony, and showing that the testimony would have been favorable to a particular defense.* This requirement applies to both uncalled lay and expert witnesses.

Woodfox v. Cain, 609 F.3d 774, 808 (5th Cir. 2010) (citations, quotation marks, and brackets omitted; emphasis added); see also Day v. Quarterman, 566 F.3d 527, 538 (5th Cir. 2009) ("[T]o prevail on an ineffective assistance claim based on counsel's failure to call a witness, the petitioner must name the witness, demonstrate that the witness was available to testify and would have done so, set out the content of the witness's proposed testimony, and show that the testimony would have been favorable to a particular defense."). Petitioner has produced no evidence, such as affidavits from the uncalled witnesses, demonstrating that they would have testified in a manner beneficial to the defense. Therefore, he clearly has not met his burden with respect to this claim. See, e.g., United States v. Cockrell, 720 F.2d 1423, 1427 (5th Cir. 1983) (courts view "with great caution

claims of ineffective assistance of counsel when the only evidence of a missing witness's testimony is from the defendant"); Buniff v. Cain, Civ. Action No. 07-1779, 2011 WL 2669277, at *3 (E.D. La. July 7, 2011); Anthony v. Cain, Civ. Action No. 07-3223, 2009 WL 3564827, at *8 (E.D. La. Oct. 29, 2009) ("This Court may not speculate as to how such witnesses would have testified; rather, a petitioner must come forward with evidence, such as affidavits from the uncalled witnesses, on that issue."); Combs v. United States, Nos. 3:08-CV-0032 and 3:03-CR-0188, 2009 WL 2151844, at *10 (N.D. Tex. July 10, 2009) ("Unless the movant provides the court with affidavits, or similar matter, from the alleged favorable witnesses suggesting what they would have testified to, claims of ineffective assistance of counsel fail for lack of prejudice."); Harris v. Director, TDCJ-CID, No. 6:06cv490, 2009 WL 1421171, at *7 (E.D. Tex. May 20, 2009) ("Failure to produce an affidavit (or similar evidentiary support) from the uncalled witness is fatal to the claim of ineffective assistance.").

### D.  Ineffective Assistance for Failing to Object to "Other Crimes" Evidence

Petitioner next claims that his counsel should have objected to the testimony regarding his purported participation in the armed robbery of the drug dealers, "Dog" and "Little Dog."  Petitioner contends that the testimony was prejudicial because it was introduced only to portray him as a "bad man."  The state argues that this claim is also unexhausted and procedurally barred; however, the undersigned recommends that it, too, simply be denied on the merits for the following reasons.

The evidence of the armed robbery was not improperly introduced to portray petitioner as a "bad man"; rather, it was properly introduced to establish the motive for Cotton's

murder (the elimination of a person who could have served as a witness against petitioner for that crime) and as part of the *res gestae*. <u>See</u> La. Code Evid. 404(B). Because the evidence was admissible, any objection by counsel to the evidence would have been meritless. Counsel is not ineffective for failing to lodge meritless objections. <u>Clark v. Collins</u>, 19 F.3d 959, 966 (5th Cir. 1994) ("Failure to raise meritless objections is not ineffective lawyering; it is the very opposite."); <u>see also</u> <u>United States v. Kimler</u>, 167 F.3d 889, 893 (5th Cir. 1999) ("An attorney's failure to raise a meritless argument ... cannot form the basis of a successful ineffective assistance of counsel claim because the result of the proceeding would not have been different had the attorney raised the issue.").

E.  Denial of Right to Testify

Petitioner next claims that he was prevented by counsel from taking the stand to testify in his own defense. In the state post-conviction proceedings, the state courts denied this claim without explanation. For the following reasons, the AEDPA requires this Court to defer to that decision.

With respect to this claim, defense counsel, Dwight Doskey, testified at the post-conviction evidentiary hearing that, although he did not recollect whether petitioner wanted to testify, he would not have, and in fact never had, prevented *any* defendant from taking the stand on his own behalf. For example, Doskey testified as follows:

> Q.  ... Do you recall whether or not Mr. Phillips wanted to testify on his own defense?
>
> A.  No.  I know what my practice would be in each and every trial that I have done over the last 30 years, but I have no

independent recollection of what went on in this particular case. I just know what my practice would have been.

Q. So, you would never tell someone not to testify if they were intent on doing so?

A. I don't think that's a fair statement. I might tell someone that it's my considered advice and I have been practicing for X number of years at the point whatever and I would think it would be foolish for them to testify, but I always emphasize that a defendant has three absolute rights, the right to decide whether or not to plead guilty or go to trial, the right to decide whether it should be a judge or a jury trial, and, finally, the decision whether or not to testify. I've always emphasized it's the defendant's right, not mine, and they have to make the ultimate call. At the same time, that is a decision that should be made upon the advice of counsel and I'm sure both Mr. Merritt and I would have gone ahead and advised him of what our thoughts were as to the wisdom of him testifying or not testifying at trial.[23]

On cross-examination, he further testified:

Q. ... [T]he petitioner has tacitly alleged that you barred him from testifying at trial. Now, you stated what your policy is. Would you have ever barred a client from testifying at trial?

A. No. I have never barred a client from testifying at trial. Sometimes, I wish I had, but I have never had.[24]

Petitioner has offered no evidence other than his own self-serving statements with respect to this claim. Moreover, he reluctantly admitted at the evidentiary hearing that he was not so much barred as simply dissuaded by counsel, testifying as follows:

_____

[23] State Rec., Vol. X of XI, transcript of June 29, 2009, pp. 25-26.

[24] State Rec., Vol. X of XI, transcript of June 29, 2009, p. 30.

Q.     ... [I]t's your testimony that your attorney, Dwight Doskey, barred you from testifying at trial?

A.     Yes.

Q.     He told you, I won't let you?

A.     He asked me – I asked him – after they made their little argument, I said, do you feel – I want to testify.  Do you feel like – He said, No, I don't feel you need to testify.

Q.     Did you specifically state, I don't care what you feel, I want to take the stand?

A.     I told him I wanted to testify.

Q.     And he specifically said, I refuse to let you testify?

A.     He didn't say it in those words, but that's what he meant.

Q.     That's what he meant.  What words did he actually use?

A.     He said that he don't feel that I need to testify.

Q.     So, he gave you his legal opinion as your counsel?

A.     Yeah.

Q.     And you chose to follow his advice?

A.     Yes.[25]

In light of the foregoing, petitioner clearly has not met his burden of proof with respect to this claim.  While "it cannot be doubted that a defendant in a criminal case has the right to take the witness stand and to testify in his or her own defense," Rock v. Arkansas, 483 U.S. 44, 49 (1987), petitioner has offered no evidence to show that counsel prevented him from testifying,

---

[25]  State Rec., Vol. X of XI, transcript of June 29, 2009, pp. 20-21.

and the record does not suggest that he ever made known to the trial court that his counsel was refusing to allow him to testify despite his stated desire to do so. Of course, the mere fact that petitioner failed to stand up in open court and insist on testifying should not be dispositive of the issue. See United States v. Mullins, 315 F.3d 449, 455 (5th Cir. 2002); see also United States v. Araujo, 77 Fed. App'x 276, 278 (5th Cir. 2003). Nevertheless, the Court cannot ignore the fact that petitioner has never presented *any* evidence to corroborate his allegations. Without more, his bare allegations that his counsel prevented him from testifying are insufficient to warrant relief. See, e.g., Underwood v. Clark, 939 F.2d 473, 475-76 (7th Cir. 1991); see also Garrett v. Cain, Civ. Action No. 10-1079, 2011 WL 1468251, at *14-15 (E.D. La. Mar. 16, 2011), adopted, 2011 WL 1468137 (E.D. La. Apr. 18, 2011); Mosley v. Cain, Civ. Action No. 06-6259, 2009 WL 2982930, at *4-5 (E.D. La. Sept. 14, 2009); White v. Cain, Civ. Action No. 06-1576, 2006 WL 3703240, at *4-5 (E.D. La. Dec. 11, 2006); Turcios v. Dretke, No. Civ. A. H-97-0515, 2005 WL 3263918, at *6 (S.D. Tex. Nov. 29, 2005).

For these reasons, the Court finds that petitioner has failed to demonstrate that the state court's decision denying this claim was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States. Accordingly, applying the AEDPA's deferential standard, this Court likewise rejects the claim.

Out of an abundance of caution, the Court further notes that if petitioner is perhaps also alleging that his counsel was ineffective for failing to call him testify, that claim fares no better. A decision whether to put a criminal defendant on the stand "is a 'judgment call' which should not easily be condemned with the benefit of hindsight." United States v. Garcia, 762 F.2d 1222, 1226

(5th Cir. 1985); <u>see also</u> <u>United States v. Mullins</u>, 315 F.3d 449, 453 (5th Cir. 2002); <u>Amos v. Cain</u>, Civ. Action No. 04-2029, 2008 WL 782472, at *11 (E.D. La. Mar. 20, 2008); <u>Curtis v. Cain</u>, Civ. Action No. 06-1676, 2008 WL 482849, at *10 (E.D. La. Feb. 13, 2008). Further, such a matter is inherently one of trial strategy, and federal *habeas* courts are not to lightly second-guess counsel's decisions on matters of trial tactics; rather, courts are to employ a strong presumption that counsel's conduct falls within a wide range of reasonable assistance and, under the circumstances, might be considered sound trial strategy. <u>Strickland v. Washington</u>, 466 U.S. 668, 689 (1984). Petitioner has not demonstrated that there is a valid reason to vary from that general rule in this case.

### F. Ineffective Assistance of Counsel (Failure to Interview/Call Witnesses)

Petitioner next claims that defense counsel was ineffective for failing to interview Dr. Meda Kaye Colvin and Cassius Conaler and to call them to testify at trial. The state courts likewise denied this claim without explanation in the state post-conviction proceedings. For the following reasons, the AEDPA requires this Court to defer to that decision.

As to Dr. Colvin, she prepared a report indicating that Moore told her: "I was shot in the back of the head. I don't know who shot me."[26] At the post-conviction evidentiary hearing, Doskey conceded that he neither interviewed Colvin nor subpoenaed her for trial. On this issue, he testified as follows:

> Q. Do you remember there was a medical record that said the victim, Mr. Moore, did not know who shot him. Do you recall that record?

---

[26] State Rec., Vol. VIII of XI, transcript of September 3, 2003, p. 204.

A. I don't recall that record specifically. I saw that there was a reference in the transcript to us having possibly just obtained it from Mr. Conaler's attorney. I do recall that issue coming up during trial. I don't recall whether or not we were provided that record before trial or during trial. I would imagine the OIDP record itself, or the trial transcript, would reflect that though. I do know that I never interviewed the doctor and I know that I never independently spoke to the doctor who treated the witness.

Q. So, you didn't subpoena her to testify?

A. No, I did not.

Q. Was there any specific reason for that?

A. Now that you mentioned it I seem to believe that she had moved out of state. I would tend to think we had seen the record before, because having a record in our possession that was favorable to us we would not have wanted to disturb that record that was favorable to us by having her coming in and giving her explanation. In hindsight, it might have been a foolish choice.

Q. So, it might have been a good idea to have her here to perhaps elaborate?

A. Well, let's put it this way. Looking back on it, I think it was stupid not to at least call her up and interview her at the very least and making that decision after having interviewed her.[27]

As an initial matter, this Court agrees with Doskey's assessment in hindsight that he should have at least interviewed Colvin. However, even if his failure to do so were found to violate the "deficient performance" prong of the Strickland test, that alone is not a sufficient basis for granting relief.

_____

[27] State Rec., Vol. X of XI, transcript of June 29, 2009, pp. 24-25.

Rather, with respect to a failure-to-interview claim, as with any <u>Strickland</u> claim, a petitioner must *also* show that he was prejudiced by counsel's failure. <u>See, e.g.</u>, <u>Washington v. Watkins</u>, 655 F.2d 1346, 1363-64 (5th Cir. 1981). Petitioner cannot show prejudice here for several reasons. First, he has not produced the required evidence, such as an affidavit from Colvin, to prove that her testimony would in fact been beneficial to the defense. Second, Colvin's report, which clearly supported the defense's argument that petitioner was unable to identify the shooter immediately after the incident, was admitted at trial,[28] and Colvin's testimony would have been simply cumulative. Third, the issue of Moore's inability to identify the shooter immediately after being shot in the head was fully discussed at trial, and the jury was unmoved. For these reasons, petitioner has not shown that he was prejudiced by the failure to call Colvin, and this claim must therefore be denied.

As to the failure to interview and/or call petitioner's co-defendant, Cassius Conaler, that claim should likewise be rejected for the following reasons.

At the post-conviction evidentiary hearing, Conaler testified that he pleaded no contest to a reduced charge of accessory after the fact.[29] He stated that he wanted to testify on petitioner's behalf but was not called as a witness. He further stated that if he had been called at trial, he would have testified that he and petitioner were not together on the night of the crimes and were not involved in the shootings.[30] At that same post-conviction hearing, both Conaler and

---

[28]  State Rec., Vol. VIII of XI, transcript of September 3, 2003, pp. 204-05.

[29]  State Rec., Vol. X of XI, transcript of June 29, 2009, pp. 3-4.

[30]  State Rec., Vol. X of XI, transcript of June 29, 2009, pp. 4-6.

petitioner testified under oath that: (1) there were joint meetings with both Doskey and Conaler present; (2) at those meetings, Doskey was made aware that Conaler wanted to testify on petitioner's behalf; and (3) Doskey actively tried to discourage Conaler from testifying, stating that would make it more likely that Conaler would himself be vigorously prosecuted in a subsequent trial.[31]

Doskey, however, remembered the events very differently. At the post-conviction hearing, he testified as follows:

> Q.    Do you remember whether or not Mr. Cassius Conaler wanted to testify for Mr. Phillips?
>
> A.    I don't remember one way or the other. We did not have any joint defense conferences wherein we brought all the defendants together in the same room. While I can't speak from personal recollection, I certainly know that Mr. Cuccia would never have consented to us interviewing Mr. Conaler alone nor ever having Mr. Conaler pass anything on to us directly. So, I don't recall him ever wanting to testify on behalf of Mr. Phillips, but that's not to say – let's just say I don't recall him ever.
>
> Q.    So you wouldn't recall any jail meetings between Mr. Conaler, his attorney, and you and Mr. Phillips?
>
> A.    No. I'm pretty sure that never took place.
>
> Q.    So, it's your testimony that you didn't interview Mr. Conaler as to his version of –
>
> A.    That's correct. I never had an interview with Mr. Conaler.[32]

---

[31]  State Rec., Vol. X of XI, transcript of June 29, 2009, pp. 32-33 (Conaler) and 37 (petitioner).

[32]  State Rec., Vol. X of XI, transcript of June 29, 2009, pp. 23-24.

The two versions of events clearly raise different concerns. If Conaler and petitioner are believed, then the purported failure to interview Conaler is less problematic, but the failure to call him as a witness is more so. On the other hand, if Doskey is believed, the failure to even attempt to interview Conaler is far more troubling.

Unfortunately, as noted, state courts offered no explanation whatsoever for their basis for denying petitioner's claim, and this Court cannot know with certainty which testimony they found more credible. However, state courts are not required to give their reasons for denying relief, and their failure to do so does not change the fact that a federal court must still review their decisions under the deferential scheme imposed by the AEDPA. As the United States Supreme Court has expressly observed:

> As every Court of Appeals to consider the issue has recognized, determining whether a state court's decision resulted from an unreasonable legal or factual conclusion does not require that there be an opinion from the state court explaining the state court's reasoning. And as this Court has observed, a state court need not cite or even be aware of our cases under § 2254(d). Where a state court's decision is unaccompanied by an explanation, the habeas petitioner's burden still must be met by showing there was *no reasonable basis* for the state court to deny relief.

Harrington v. Richter, 131 S.Ct. 770, 784 (2011) (citations omitted; emphasis added).

Therefore, when, as here, the state courts have given us nothing more than their ultimate conclusion without benefit of their underlying reasoning, this Court must determine whether there exists any scenario which could serve as a reasonable basis for the state court's decision to deny petitioner's claim. If there is, then this Court must defer to that decision.

Clearly, there is such a version in this case. The state courts could have believed Conaler and petitioner. If they did, then the failure to further interview Conaler is not so troublesome. In that scenario, there was no compelling need for a further interview because Doskey already knew the crucial information at issue, i.e. that Conaler was willing to testify that petitioner was wrongly accused. The question then becomes whether the state courts could have reasonably concluded that Doskey, despite being armed with that knowledge, was still providing effective assistance of counsel in declining to call Conaler to testify at petitioner's trial. The courts obviously could have reasonably reached such a conclusion for the following reasons.

There is a strong presumption that counsel's decision regarding whether to call a witness is one of trial strategy. Murray v. Maggio, 736 F.2d 279, 282 (5th Cir. 1984); see also Green v. Cockrell, No. 02-20650, 2003 WL 21145722, at *2 (5th Cir. Apr. 29, 2003) ("A strategic or tactical decision not to call particular witnesses does not constitute ineffective assistance."); Buckelew v. United States, 575 F.2d 515, 521 (5th Cir. 1978) ("[C]omplaints based upon uncalled witnesses are not favored, because the presentation of testimonial evidence is a matter of trial strategy ...."). The United States Supreme Court has cautioned courts not to second-guess counsel's decisions on such matters of trial tactics through the distorting lens of hindsight; rather, courts are to employ a strong presumption that counsel's conduct falls within a wide range of reasonable assistance and, under the circumstances, might be considered sound trial strategy. Strickland, 466 U.S. at 689.

That presumption is particularly applicable in instances such as this. As the United States First Circuit Court of Appeals has noted:

The decision whether to call a particular witness is almost always strategic, requiring a balancing of the benefits and risks of the anticipated testimony. The witness may not testify as anticipated or the witness's demeanor or character may impress the jury unfavorably and taint the jury's perceptions of the accused; or the testimony, though sympathetic, may prompt jurors to draw inferences unfavorable to the accused. Where the prosecution's case is less than compelling ..., the risk of "rocking the boat" may warrant a decision by trial counsel to forego the presentation of further defense testimony, even favorable testimony. Johnson v. Lockhart, 921 F.2d 796, 800 (8th Cir.1990) ("since the government has the burden of proving guilt beyond a reasonable doubt, it may not be necessary for the defense to introduce evidence to meet the constitutional requirement of effective representation"); cf. [United States v.] Natanel, 938 F.2d [302, 310 (1st Cir. 1991)] ("additional arguments could only impair [a] client's seemingly secure position.... In litigation, as in life, there is much to be said for such maxims as 'if it ain't broke, don't fix it,' and 'quit when you're ahead'").

Lema v. United States, 987 F.2d 48, 54 (1st Cir. 1993) (citations omitted). The court continued:

Reasonably competent trial counsel might well have determined that the best prospect for acquittal lay in discrediting the government's witnesses, rather than presenting additional testimony which could appear to legitimate the government's case or raise questions about the defense not previously suggested by the government's evidence.

Id.

Under the facts of this case, where the state was relying on a sole eyewitness who purportedly initially stated that he could not identify the shooter, counsel cannot be considered ineffective in opting simply to try to discredit the state's case rather than taking the chance of alienating the jury by presenting the questionable testimony of a co-defendant with prior convictions[33] whose testimony that he and petitioner were not involved would clearly be self-serving

---

[33] State Rec., Vol. X of XI, transcript of June 29, 2009, p. 5.

in that Conaler still had charges pending against him for the same crime. Therefore, a reasonable

basis obviously exists for the state court's decision to deny petitioner's claim.

Moreover, the fact that some jurists might have reached a contrary conclusion with

respect to petitioner's claim is of no moment. That simply is not the test; in fact, the test required

the AEDPA is quite the opposite. As the Supreme Court has explained:

> Surmounting <u>Strickland</u>'s high bar is never an easy task. An ineffective-assistance claim can function as a way to escape rules of waiver and forfeiture and raise issues not presented at trial, and so the <u>Strickland</u> standard must be applied with scrupulous care, lest intrusive post-trial inquiry threaten the integrity of the very adversary process the right to counsel is meant to serve. Even under *de novo* review, the standard for judging counsel's representation is a most deferential one. Unlike a later reviewing court, the attorney observed the relevant proceedings, knew of materials outside the record, and interacted with the client, with opposing counsel, and with the judge. It is all too tempting to second-guess counsel's assistance after conviction or adverse sentence. The question is whether an attorney's representation amounted to incompetence under prevailing professional norms, not whether it deviated from best practices or most common custom.
>
> Establishing that a state court's application of <u>Strickland</u> was unreasonable under § 2254(d) is all the more difficult. The standards created by <u>Strickland</u> and § 2254(d) are both highly deferential, and when the two apply in tandem, review is doubly so. The <u>Strickland</u> standard is a general one, so the range of reasonable applications is substantial. Federal habeas courts must guard against the danger of equating unreasonableness under <u>Strickland</u> with unreasonableness under § 2254(d). When § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is *any reasonable argument* that counsel satisfied <u>Strickland</u>'s deferential standard.

<u>Harrington v. Richter</u>, 131 S.Ct. 770, 788 (2011) (citations and quotation marks omitted; emphasis

added). Here, as explained, there obviously is such a reasonable argument, and petitioner's claim

must therefore be denied.

In summary, petitioner has failed to demonstrate that the state court's decision rejecting this claim was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States. Accordingly, utilizing the AEDPA's doubly deferential standard applicable to ineffective assistance claims, this Court likewise rejects petitioner's claim.

G.  Ineffective Assistance of Counsel (Failure to Adequately Cross-Examine Duzac)

Petitioner also claims that defense counsel was ineffective for failing to adequately cross-examine Detective John Duzac. Again, although the state courts denied this claim without explanation, the AEDPA requires this Court to defer to that decision for the following reasons.

It is clear that "[t]he decision whether to cross-examine a witness, and if so, how vigorously to challenge the witness' testimony, requires a quintessential exercise of professional judgment." Ford v. Cockrell, 315 F. Supp. 2d 831, 859 (W.D. Tex. 2004), aff'd, 135 Fed. App'x 769 (5th Cir. 2005); see also Parker v. Cain, 445 F. Supp. 2d 685, 710 (E.D. La. 2006). As previously explainned, courts are not to second-guess counsel's decisions on such tactical matters through the distorting lens of hindsight; rather, we are to employ a strong presumption that counsel's conduct falls within a wide range of reasonable assistance and, under the circumstances, might be considered sound trial strategy. Strickland, 466 U.S. at 689. Moreover, it is irrelevant that another attorney might have made other choices or handled such issues differently. As the Supreme Court noted: "There are countless ways to provide effective assistance in any given case. Even the best criminal defense attorneys would not defend a particular client in the same way." Id.

In the instant case, petitioner claims that his counsel should have questioned Duzac at trial about his testimony at a pretrial suppression hearing. At that pretrial hearing, Duzac testified:

> I received a phone call from [Delacie Phillips'] probation agent. He told me that he had Delacie Phillips in his office. This is before I had him identified in the homicide. I told the agent that he would be – that shortly I would have – I was positive I would have an arrest warrant for first degree murder on that man, Delacie Phillips.
> At which time he told me that he was applying to go out of town to Florida to receive some type of surgery on his achilles tendon. And when I told him that an arrest warrant was imminent, he told him he was not going to allow him to leave, he was going to lock him down right then and there. Then he was re-booked for first degree murder shortly thereafter.[34]

Petitioner opines that questioning Duzac about this testimony at trial would have proved damning because it would have shown that Duzac intended to have petitioner identified and arrested for this crime "no matter what it took."[35] That is not true.

Contrary to petitioner's contention, Duzac's comments at the suppression hearing in no way indicate that he had a vendetta against petitioner and would have arrested him regardless of any lack of evidence. Rather, Duzac's comments simply reflected his belief that there was a strong case against petitioner and that his arrest was imminent. Such a belief was clearly warranted, in that Moore had already told his family that petitioner was the perpetrator. Although Duzac had not yet taken a photographic line-up to Moore for an official identification, there was every reason to believe that was a simple formality because Moore personally knew petitioner and had already identified him by name. In light of those facts, there is no reasonable probability that the result of

---

[34] State Rec., Vol. VI of XI, transcript of March 28, 2002, pp. 13-14.

[35] Rec. Doc. 3, p. 39.

the trial would have been different if Duzac had been cross-examined concerning on those comments.

In summary, petitioner has not shown that counsel performed deficiently in this regard or that prejudice resulted. Therefore, petitioner has failed to demonstrate that the state court's decision rejecting this claim was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States. Accordingly, utilizing the AEDPA's doubly deferential standard applicable to ineffective assistance claims, this Court likewise rejects petitioner's claim.

### H. Ineffective Assistance of Counsel (Failure to Prepare Witnesses)

Lastly, petitioner also claims that defense counsel was ineffective for failing to interview and prepare Lisa Washington (petitioner's former girlfriend), Detrice Murray (petitioner's daughter), or Mallory Washington (Lisa Washington's daughter) for their testimony at trial. Although the state courts likewise denied this claim without explanation, the AEDPA requires this Court to defer to their decision for the following reasons.

The three witnesses at issue were called by the defense to testify on three points: (1) petitioner had an injured ankle at the time the crime was committed; (2) he lived in a house without a washer or dryer; and (3) he, prior to his arrest, argued with Justin Moore in a telephone call. The witnesses, as intended, testified as to those purported facts. Because petitioner has failed to explain, much less prove, what more would have been accomplished by earlier interviews or more thorough preparation, he has not shown that he was prejudiced by the alleged defects in the interviews and preparation. Accordingly, this claim must be denied because petitioner has not demonstrated that

the state court's decision rejecting this claim was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States.

## **RECOMMENDATION**

Accordingly, **IT IS RECOMMENDED** that the petition for federal *habeas corpus* relief filed by Delacie Phillips be **DISMISSED WITH PREJUDICE**.

A party's failure to file written objections to the proposed findings, conclusions, and recommendation in a magistrate judge's report and recommendation within fourteen (14) days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court, provided that the party has been served with notice that such consequences will result from a failure to object.  28 U.S.C. § 636(b)(1); <u>Douglass v. United Services Auto. Ass'n</u>, 79 F.3d 1415, 1430 (5th Cir. 1996) (en banc).[36]

New Orleans, Louisiana, this eleventh day of April, 2012.



**SALLY SHUSHAN**
**UNITED STATES MAGISTRATE JUDGE**

---

[36] <u>Douglass</u> referenced the previously applicable ten-day period for the filing of objections. Effective December 1, 2009, 28 U.S.C. § 636(b)(1) was amended to extend that period to fourteen days.